IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARBARA EDWARDS,

                Plaintiff,

    v.

MARQUIS COMPANIES I, INC., an Oregon
Corporation, and JUDY HOLZNAGEL, an individual,

                Defendants.

No. CV 08-390-MO

OPINION & ORDER

**MOSMAN, J.,**

In this employment dispute, plaintiff Ms. Barbara Edwards alleges defendant Marquis

Companies I, Inc. ("Marquis") terminated her employment for discriminatory reasons, defamed

her, and intentionally caused her severe emotional distress.  Ms. Edwards brought ten claims

against Marquis, including disability discrimination under both Oregon law and the federal

Americans with Disabilities Act ("ADA"), interference and retaliation claims for taking

statutorily protected leave under the federal Family and Medical Leave Act ("FMLA") and the

Oregon Family Leave Act ("OFLA"), age discrimination under both Oregon law and the federal

Age Discrimination in Employment Act ("ADEA"), failure to pay wages within one day of

termination as required under Oregon law, defamation, intentional infliction of emotional distress

("IIED"), and wrongful discharge.  She also brought defamation and IIED claims against one of

her former supervisors, Ms. Judie Holznagel.

PAGE 1 - OPINION & ORDER

Defendants moved for summary judgment on all claims.  At oral argument, I denied summary judgment as to the FMLA/OFLA interference claims and the federal and state age discrimination claims, but granted summary judgment as to the FMLA/OFLA retaliation claims, failure to pay wages, and IIED claims.  This written opinion addresses the remaining disability discrimination, defamation, and wrongful discharge claims.  For the reasons discussed below, I DENY Marquis's motion for summary judgment as to the disability discrimination claims under both Oregon and federal law, GRANT summary judgment as to the defamation claim, and DENY summary judgment as to the wrongful discharge claim.

## BACKGROUND

At the time of her termination in 2007, Ms. Edwards had worked at least 12 years in Marquis's facilities in both Oregon and Idaho.  (Defs.' Am. Concise Statement of Material Facts ("CSMF") (#109) ¶ 1.)  During her last six years with Marquis, from 2001 through 2007, she worked at the company's facility in Piedmont, Oregon.  (*Id.*)  With the exception of some criticisms and potential areas for improvement, the existing record shows that she generally received positive evaluations for her work performance over the course of her career and earned pay raises on more than one occasion.  (Edwards Decl. (#97) Ex. 101-08.)

In October 2007, Ms. Edwards had multiple supervisors relevant to this complaint:  Ms. Holznagel was a field auditor, Ms. Beth Biggs was Marquis's Director of Operations, and Ms. Marnie Davisson was the Administrator of the Piedmont facility.  (Holznagel Decl. (#74) ¶ 1; Biggs Decl. (#75) ¶ 1; Davisson Decl. (#71) ¶ 1.)

In 2004, Ms. Edwards was diagnosed with fuchs dystrophy, a degenerative eye disease that can lead to total blindness.  (Defs.' Am. CSMF (#109) ¶ 6.)  Her eyesight deteriorated over

the course of the following several years. (Biggs Decl. (#75 ) Ex. 4.) She then disclosed her

disease to Marquis and two supervisors in August 2006, at the age of 58. (Edwards Decl. (#97) ¶

20.) Also in August of 2006, Ms. Marnie Davisson became Administrator of the Piedmont

facility and gave Ms. Edwards a performance evaluation. (Davisson Decl. (#71) ¶¶ 1, 7.) This

2006 evaluation was again generally positive, but emphasized that Ms. Edwards needed to

improve the percentage of accounts receivable outstanding. (Biggs Decl. (#75) Ex. 1.)

Ms. Edwards underwent corneal transplant surgery on her left eye and took her first

FMLA/OFLA protected leave from February 21, 2007, until March 6, 2007. (Defs.' Am. CSMF

(#109) ¶ 10.) The existing record is unclear as to the specific date, but Ms. Edwards also stopped

driving at some point before her surgery, and did not drive for some time period after her surgery,

because she was having trouble seeing. (Tracey Decl. (#76) Ex. 1 at 7.) Marquis did not deny

Ms. Edwards's leave request and restored her back to her original position upon her return. (*See*

Defs.' Am. CSMF (#109) ¶ 10.) On March 15, 2007, a little more than one week after her return

from protected leave, Ms. Edwards received a disciplinary warning. (Biggs Decl. (#75) Ex. 2.)

On March 22, 2007, Ms. Edwards wrote a letter to Ms. Davisson claiming she felt

"discriminated against" due to her disability. (Biggs Decl. (#75) Ex. 4.) In the letter, she

outlined how her vision had progressively worsened over the prior three years, her upcoming

surgery, and noted her use of a magnifying glass at work for the previous eight to ten months.

(*Id.*) Also on March 22, 2007, Ms. Edwards's doctor wrote a brief note describing her condition

and stating, "[a]lthough the patient can accomplish work at a computer, it may be slower for her

to do so than her normal pace, once her vision has returned to a normal level after the healing has

taken place with her corneal transplant." (*Id.* at Ex. 9.)  The doctor's note goes on to request

Marquis to be patient during Ms. Edwards's "visual rehabilitation." (*Id.*)

Shortly thereafter, on March 26, 2007, Ms. Biggs requested a memo from Ms. Holznagel

about Ms. Edwards's past performance.  (Holznagel Decl. (#74) ¶ 11; Lackey Decl. (#117) Ex.

8.)  In the memo, Ms. Holznagel included the phrase, "[h]istorically, Bobby has had trouble in

each building she has been in with [accounts receivable]." (*Id.* at Ex. 8.)  In the subsequent

sentences and paragraphs, Ms.  Holznagel recounted her own observations and experiences with

Ms. Edwards and also attached an accounts receivable trend report as evidence of her

inconsistent performance. (*Id.*)  Ms. Davisson also read Ms. Holznagel's memo sometime during

2007. (*Id.* at Ex. 5 at 16.)

In early April 2007, Ms. Edwards and Ms. Davisson signed a letter requesting special

accommodations such as a large print keyboard, a flat screen monitor, a computer desk light,  a

monitor stand, and a change in hours.  (Biggs Decl. (#75) Ex. 5.)  It is unclear if or when all the

items were ordered, but Marquis permitted Ms. Edwards to come in later because she had

difficulty seeing, reading, and working in the mornings. ( Davisson Decl. (#71) ¶ 13; *see also*

Biggs Decl. (#75) Ex. 5-6.)

Ms. Edwards underwent her second corneal transplant and took her second protected

leave from May 16 through June 13, 2007.  (Defs.' Am. CSMF (#109) ¶ 10.)  According to Ms.

Edwards, Ms. Holznagel then became upset and told her to "get a different job."  (Edwards Decl.

(#97) ¶ 29; Pl.'s Resp. (#96) 10.)

Ms. Edwards requested a light and additional desk space again on July 12, 2007.  (Biggs

Decl. (#75) Ex. 6.)  The record indicates that items were ordered July 13, 2007.  (*Id.*)

PAGE 4 - OPINION & ORDER

The following week, Ms. Edwards spoke with Ms. Holznagel and informed her that she needed to take further medical leave. (Tracey Decl. (#76) Ex. 1 at 15-16.) According to Ms. Edwards, Ms. Holznagel expressed some displeasure during this conversation. (*Id.*)

Ms. Edwards then took her third protected leave from July 18, 2007 until August 15, 2007, due to depression. (Defs.' Am. CSMF (#109) ¶ 10.) A little more than one week after her return to work, Ms. Davisson gave Ms. Edwards a performance evaluation. (Biggs Decl. (#75) Ex. 11.) The evaluation noted poor performance in several areas and placed Ms. Edwards on a ninety-day probation. (*Id.*) Ms. Edwards wrote a brief comment at the end of the evaluation, noting her poor vision and its impact on her work performance. (*Id.* at Ex. 10 at 7.)

Marquis terminated Ms. Edwards in early October, pointing to a lack of progress during her ninety-day probationary period. (Davisson Decl. (#71) ¶ 24.) Ms. Davisson and Ms. Biggs met with Ms. Edwards on October 4, 2007, and told her of the company's decision. (*Id.* at ¶ 25.) Ms. Edwards again wrote a brief note that her vision was still very poor and impacting her performance. (Biggs Decl. (#75) Ex. 13 at 3.)

Ms. Edwards has since sold her house and moved to another location. (Tracey Decl. (#76) Ex. 1 at 24.) Although the dates in the record are not specific, it appears that she was unable to drive before and after her surgeries, but she has driven since then and continues to drive. (*Id.* at 7.) She also takes care of her grandson during the day, reading him books, taking him to the park, watching movies, and playing. (*Id.* at 22.) In 2006 and 2007, Ms. Edwards also took care of another very young grandson, helping him with homework, driving him places, and playing with him. (*Id.* at 2-3, 5, 8.) She also worked for a short time at a Ross department store in 2008. (*Id.* at 22.)

PAGE 5 - OPINION & ORDER

According to both her amended complaint and declaration, Ms. Edwards's fuchs dystrophy continues to be disabling. (Second Am. Compl. (#90) ¶ 58; Edwards Decl. (#97) ¶ 21.) She claims her vision is like "constantly seeing through bubble glass." (Edwards Decl. (#97) ¶ 21.) She also states that she has difficulty driving, reading, and accomplishing menial tasks such as reading bank statements or using an ATM. (*Id.*) Ms. Edwards further alleges that she requires more surgery on her right eye and additional treatment for both eyes to improve her vision, but does not have enough money or medical insurance to pay for the procedure. (*Id.* ¶¶ 21, 49.) She claims that she remains constantly worried and does not sleep well because of her financial and health problems. (Edwards Decl. (#97) ¶¶ 48, 49.)

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant initially shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond with evidence setting "out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party has the "burden of advertising [sic] to 'specific facts showing that there is a genuine issue for trial.' . . . It is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N. R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine

issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(citation omitted).

## DISCUSSION

At oral argument, the Court ruled on all but the disability discrimination, defamation, and

wrongful discharge claims.  This written opinion discusses these remaining claims in turn.

## I.    Federal and State Disability Discrimination Claims

Ms. Edwards brought disability discrimination claims against Marquis under both the

ADA and Oregon law.[1]  Marquis argues that Ms. Edwards was never substantially limited in her

daily activities and otherwise fails to present a prima facie case of an ADA-recognized disability.

I disagree.

The ADA prohibits an employer from discriminating "against a qualified individual with

a disability because of a disability."  42 U.S.C. § 12112(a) (amended 2009).[2]  In order to establish

a prima facie case[3] of employment discrimination under the ADA, a plaintiff must show that she:

---

[1]  The analysis is substantially similar under both statutory regimes.  The relevant Oregon statutory provisions are "construed to the extent possible in a manner that is consistent with any similar provisions of the federal [ADA]."  Or. Rev. Stat. § 659A.139; *see also Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 n.1 (9th Cir. 2001); *Henderson v. Jantzen, Inc.*, 719 P.2d 1322, 1324 (Or. Ct. App. 1986).  The standards for establishing a prima facie case under Oregon law are also identical to the standards used under federal law.  *Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).  Furthermore, the parties appear to agree that Ms. Edwards's state law disability claim is governed by the same standards as her federal claim, having discussed only the federal standard and Oregon Revised Statutes Section 659A.139 in their briefs.

[2]  The ADA was amended by the ADA Amendments Act of 2008 ("ADAAA") effective January 1, 2009.  As discussed below, this opinion applies the more stringent ADA and case law interpretations that existed prior to the ADAAA's enactment.

[3]  The Ninth Circuit analyzes ADA cases using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Snead*, 237 F.3d at 1093;

PAGE 7 - OPINION & ORDER

(1) has a disability; (2) is a qualified individual under the act; and (3) suffered an adverse

employment action because of the disability.  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243,

1246 (9th Cir. 1999); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007).  The

ADA goes on to define a "disability" as requiring: (1) a physical or mental impairment that

substantially limits one or more of the major life activities of the individual; (2) a record of such

an impairment; or (3) being regarded as having such an impairment.[4]  42 U.S.C. § 12102(2)

(amended 2009).

    In arguing that Ms. Edwards failed to show a qualifying disability, Marquis asserts that

she did not present evidence that her condition "substantially limited" her in the major life

activity of seeing.  The parties also dispute the applicable legal standard, arguing over whether

the Court should apply:  (1) the case law stemming from *Toyota Motor Mfg., Ky., Inc. v.*

*Williams*, 534 U.S. 184 (2002), *superseded by* statute, ADA Amendments Act of 2008, Pub. L.

No. 110-325, 122 Stat. 3553; *Sutton v. United Air Lines*, 527 U.S. 471 (1999), *superseded by*

---

*Livingston v. Fred Meyer Stores, Inc.*, 567 F. Supp. 2d 1265, 1269 (D. Or. 2008).  This approach
first requires plaintiff to establish a prima facie case and then shifts the burden to the defendant
to articulate a legitimate, nondiscriminatory reason for its actions.  *McDonnell Douglas Corp.*,
411 U.S. at 802-03.  The burden then shifts back to the plaintiff to show the defendant's
explanation was merely pretext for a discriminatory motive.  *Id.* at 804.  In this action, however,
any analysis beyond the prima facie stage is unproductive because Marquis only contests the
disability prong of the prima facie case and does not specifically articulate a legitimate,
nondiscriminatory reason for terminating Ms. Edwards within the context of her disability
discrimination claim.  Further, Ms. Edwards's allegations establishing a prima facie case also
show pretext and raise a question of whether Marquis's explanations are "unworthy of credence."
*Livingston*, 567 F. Supp. 2d at 1270 (citing *Tex. Dep't. of Comty. Affairs v. Burdine*, 450 U.S.
248, 256 (1981)).  Ms. Edwards's claim thus would survive summary judgment under the
*McDonnell Douglas* approach.

    [4] Ms. Edwards argued that even if she did not suffer from an ADA-qualifying disability,
she was regarded as disabled.  At oral argument, I noted the absence of evidence in the record to
support this assertion.  Therefore, that particular theory of disability is not addressed here.

statute, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, and related

decisions that were in effect at the time of Marquis's conduct (the "*Toyota*/*Sutton* standard"); or

(2) the more broad-reaching and recently-enacted ADA Amendments Act of 2008 ("ADAAA"),

which overturned the prior case law but did not go into effect until January 1, 2009. Marquis

argues that the ADAAA is not retroactive, and the more stringent case law standards should

apply to this action.

There is also dispute over Ms. Edwards's sworn declaration. Marquis argues that the

declaration contradicts Ms. Edwards's prior deposition and thus qualifies as discardable sham

testimony. Ms. Edwards asserts the declaration is simply a clarification or explanation of her

prior deposition and should remain in the record.

Because I find that Ms. Edwards has met her burden under even the more stringent

*Toyota*/*Sutton* standard without reliance on her sworn declaration,[5] I DENY Marquis's motion for

summary judgment as to the disability discrimination claim.

### A.    *"Substantially Limited" Under the Toyota/Sutton Standard*

Under the *Toyota*/*Sutton* standard, "substantially limited" is a demanding standard that

requires an impairment to prevent or severely restrict an individual from performing activities

that are of central importance to most people's daily lives. *Toyota Motor Mfg.*, 534 U.S. at 197-

98. Comparative or medical evidence is not required, but in order to show a substantially

limiting visual impairment a plaintiff must present evidence that the impairment prevents or

---

[5] The Court has substantial concern that Ms. Edwards's declaration, as it pertains to her limitations, is indeed a "sham" declaration. However, because there remains minimally sufficient evidence in the record without reference to it, I do not rely on her declaration inasmuch as it describes the limitations of her impairment.

severely restricts her use of eyesight as compared to how unimpaired individuals use their eyesight in daily life. *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005) (finding that sworn affidavits alleging serious difficulty sleeping and a medical diagnosis were enough to create a triable issue of fact as to whether plaintiff was substantially limited in a major life activity); *EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 797, 799 (9th Cir. 2002) (determining that applicants with monocular vision were not substantially limited in their daily activities because they drove, read, used tools, and played sports without trouble). Furthermore, any determination of whether an impairment substantially limits a major life activity must take into account medication or other measures that mitigate or correct the negative effects caused by the impairment. *Sutton*, 527 U.S. at 482.

Case law and federal regulations also state that an impairment's duration and long-term impact are important factors in determining whether it is substantially limiting. *Toyota Motor Mfg.*, 534 U.S. at 198-99; 29 C.F.R. §§ 1630.2(j)(2)(i)-(ii). Federal regulations have attempted to define the length of time and long-term impact necessary to support a "substantially limited" finding. The appendix to the regulations states, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. pt. 1630, App. § 1630.2(j). Therefore, temporary injuries with minimal residual effects cannot be the basis of an ADA claim. *See Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996) (determining that a psychological impairment lasting four months is not long enough to establish a disability under the ADA). District Courts interpreting the regulations have found that residual effects that continue to substantially limit daily activities for more than two years are probably sufficient to establish a disability, but long-term injuries are not sufficient if the injured

party makes a full recovery. *Norris v. Allied-Sysco Food Servs., Inc.*, 948 F. Supp. 1418, 1434

(N.D. Cal. 1996) (finding that continuing back pain for over two years is not a temporary injury);

*Rakestraw v. Carpenter Co.*, 898 F. Supp. 386, 390 (N.D. Miss. 1995) (determining that a back

injury from which the plaintiff fully recovered after one year and ten months was only a

temporary injury and not a long-term disability).   Overall, there is no bright-line test or required

duration, but continued residual effects and the absence of any full recovery are both strong

evidence of a disability rather than short-term illness or injury.  *See Norris*, 948 F. Supp. at 1434.

Viewing the evidence in the light most favorable to the non-moving party and drawing all

inferences in her favor, the record provides sufficient evidence of a longstanding and

substantially limiting impairment that prevented Ms. Edwards from performing daily activities

such as reading and working in a manner similar to other individuals.  Ms. Edwards authored a

letter to one of her supervisors in March 2007 that specifically notes her eyesight has

"progressively gotten worse" during the previous three year period.  (Biggs Decl. (#75) Ex. 4.)

That same letter discusses her use of a magnifying glass to do her job, stating that she "[has] a lot

of trouble reading" and is "very slow" at work.  (*Id.*)  Although any determination of disability

requires the Court to take into account mitigating or corrective measures such as a magnifying

glass, a party can still be disabled if, even with the medication or corrective measures, she is

substantially limited in a major life activity.[6]  *Sutton*, 527 U.S. at 488 ("The use of a corrective

device does not, by itself, relieve one's disability.  Rather, one has a disability . . . if,

---

[6] The Court notes that under the newly amended ADAAA, Ms. Edwards would qualify as
disabled because the determination of her disability must be made without regard to the
"ameliorative effects of mitigating measures such as . . . low vision devices."  ADA Amendments
Act of 2008, Pub. L. No. 110-325, § 3(4), 122 Stat. 3553, 3556.

notwithstanding the use of a corrective device, that individual is substantially limited.").

Therefore, even though Ms. Edwards managed to read with the help of a magnifying glass, her

statements suggest she was significantly slower and substantially limited in her ability to read

and work because of her deteriorating vision.

Other documentation in the record reveals that Ms. Edwards required special

accommodations at work.  (Biggs Decl. (#75) Ex. 5-6.)  Ms. Edwards requested, and Marquis

appears to have agreed to provide, a large keyboard, flat screen monitor, computer light, and

monitor stand to help her poor vision.  (*Id.*)  Ms. Davisson also agreed to change Ms. Edwards's

work hours so that she could work later in the day when her vision was better.  (Davisson Decl.

(#71) ¶ 13.)  Although employer-provided accommodations are not conclusive evidence of an

ADA-recognizable disability or that the employer regarded the employee as disabled, *Thornton v.*

*McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir. 2001), they do further suggest Ms.

Edwards was substantially limited in her daily activities and ability to read or work.

The record also contains two brief, handwritten notes by Ms. Edwards explaining her

continued poor vision and how it has impacted her job performance.  The comments attached to

her August 24, 2007, evaluation note, "[t]he vision is still not corrected . . . the things that are

expected [at] this time [are] difficult for me to meet because of my vision." (Biggs Decl. (#75)

Ex. 10 at 7.)  Along similar lines, her comments attached to her October 4, 2007, probationary

review read, "My vision has been a disability to my job . . . I am not as accurate and as fast with

everything like I use[d] to be." (*Id.* at Ex. 13 at 3.)  This pattern of comments and Ms. Edwards's

undisputed difficulties with her vision are evidence that she suffered residual and continually

worsening effects over the course of three-plus years; such a long duration suggests and creates

an issue of fact as to whether she was "substantially limited" in the major life activity of seeing and related daily tasks such as reading and working.

A doctor's note to Ms. Edwards's supervisors at Marquis also provides evidence of a long-term impairment. The letter reads, "[s]he will not have sufficient visual acuity to perform tasks at a computer rapidly for at least another two to three months. Although the patient can accomplish work at a computer, it may be slower for her to do so than her normal pace, once her vision has returned to a normal level after the healing has taken place with her corneal transplant." (Biggs Decl. (#75) Ex. 9.) This phrasing is ambiguous and can be read to mean that she would return to normal levels of productivity within two to three months, or that Ms. Edwards would remain slower than her normal pace even after she recovered from her corneal transplant. Drawing all inferences in favor of the non-moving party, the Court must accept the reading that Ms. Edwards would not return to her normal pace even after recovering from the surgery. This is further evidence of long-term residual effects and substantial limitations to Ms. Edwards's daily activities.

Marquis asserts that Ms. Edwards is not substantially limited in her daily activities and points to deposition testimony that she drives, takes care of her grandchildren, and pays bills. (Tracey Decl. (#76) Ex. 1 at 7, 22.) According to her deposition, Ms. Edwards also drove, took care of a grandchild from 2006 to 2007, and worked for a short time at Ross in 2008. (*Id.* at 2-6, 23.) The deposition testimony, however, is not time-specific or detailed with regard to the manner in which Ms. Edwards performed and continues to perform these daily activities. For example, Ms. Edwards's statements about her ability to drive offer very little insight or explanation into when she drove, how often, for what distances, or whether it was difficult for

PAGE 13 - OPINION & ORDER

her to do so.  (*Id.* at 7-8.)  Similarly, Ms. Edwards noted in her deposition testimony that she read

and helped her grandchild do homework, but there is no reference or explanation of whether she

used her magnifying glass, simply helped him orally, or was able to help him on a consistent

basis.  (*Id.* at 5-6.)  Again drawing all inferences in her favor, Ms. Edwards's brief statements of

driving and caring for her grandchildren are not specific enough to contradict other evidence in

the record supporting the assertion that she was substantially limited in the major life activity of

seeing.

　　　　Ms. Edwards's evidence of being substantially limited as defined under the ADA and the

*Toyota*/*Sutton* standard is minimally sufficient such that a rational juror could find in her favor.

Her disability discrimination complaint should therefore survive summary judgment.  In light of

the facts and applicable legal standards discussed above, I conclude that Ms. Edwards has met

her burden and DENY Marquis's motion for summary judgment as to the disability

discrimination claims under both federal and Oregon law.

## II.  Defamation

　　　　Ms. Edwards also filed a state action for defamation against both Marquis and Ms.

Holznagel.  Defendants assert that Ms. Holznagel's statement, "[h]istorically, [Ms. Edwards] has

had trouble in each building she has been in with [accounts receivable]," is not defamatory

because it is an opinion based on fully disclosed factual observations.[7]  (Lackey Decl. (#99) Ex.

112.)  Ms. Edwards responds that the statement is actionable because it implies the existence of

untrue and defamatory facts, and summary judgment is therefore inappropriate.  I disagree.

-------

[7] Defendants asserted two additional defenses: the statement was not defamatory as a
matter of law and the statements fell under a conditional privilege.  Because the opinion defense
applies and best supports defendants' position, I do not reach these arguments.

PAGE 14 - OPINION & ORDER

Because Ms. Holznagel's statement relies specifically on her own, uncontradicted observations and interactions with Ms. Edwards, the memo is properly classified as an opinion based on fully disclosed, true factual observations. Therefore, I grant summary judgment as it pertains to the defamation claim.

In order to establish a claim for defamation, a plaintiff must show that defendants: (1) made a defamatory statement; (2) published or communicated it to a third party; and (3) that the statement was false. *See Simpson v. Burrows*, 90 F. Supp. 2d 1108, 1126 (D. Or. 2000). Although statements of "pure opinion" are not actionable, an opinion statement that implies the existence of undisclosed, untrue defamatory facts does support a cause of action. *Hickey v. Settlemier*, 917 P.2d 44, 48 (Or. Ct. App. 1996). When an opinion relies solely on disclosed factual assertions, the defendant is only liable if those factual assertions are both defamatory and false.[8] *See id.* at 48-49.

A statement is capable of a defamatory meaning if it would "subject the plaintiffs 'to hatred, contempt or ridicule, [or] tend to diminish the esteem, respect, goodwill, or confidence in each is held, or to excite adverse, derogatory or unpleasant feelings or opinions against them.'" *Farnsworth v. Hyde*, 512 P.2d 1003, 1004 (Or. 1973) (quoting *Andreason v. Guard Publ'g Co.*, 489 P.2d 944, 945 (Or. 1971)). Statements that impute unfitness on an individual's ability to perform his or her occupation are typically capable of defamatory meaning *per se*. *Bock v. Zittenfield*, 672 P.2d 1237, 1239 (Or. Ct. App. 1983) (finding that a statement of unsatisfactory performance was capable of a defamatory meaning because a jury could infer that plaintiff

---

[8] This is simply a round-about way to arrive at a traditional defamation claim—factual assertions communicated to a third party that are both defamatory and false.

generally lacked the skill and qualities necessary to perform his job); *Fender v. City of Oregon City*, 811 F. Supp. 554, 556 (D. Or. 1993) (ruling that the statement, "He's been doing the job we asked [plaintiff] to do, but didn't do," created an inference of insubordination or incompetence and was capable of defamatory meaning). *L&D of Or., Inc. v. Am. States Ins. Co.*, 14 P.3d 617, 622 (Or. Ct. App. 2000) ("We have held that defamatory statements that attack a person in their professional or employment capacity are actionable *per se* when they attack specific characteristics that pertain to the field of employment of the plaintiff.")

To be actionable, a defamatory statement must also be false. *See Reesman v. Highfill*, 965 P.2d 1030, 1034 (Or. 1998) (citing *Harley-Davidson Motorsports, Inc. v. Markley*, 568 P.2d 1359, 1361 (Or. 1977)). The defendant has the burden of proving, as an affirmative defense, the statement's truth. *Fowler v. Donnelly*, 358 P.2d 485, 488 (Or. 1960) (citations omitted). It is not necessary to prove the statement is literally true, however; slight inaccuracies are tolerated if the statements remain substantively true. Restatement (Second) of Torts § 581A cmt. f (1977). A plaintiff establishes the third element, publication, simply by showing that the statement was communicated to a third party. *Wallulis v. Dymowski*, 918 P.2d 755, 758 (Or. 1996) (citing *State ex rel. Advanced Dictating Supply, Inc. v. Dale*, 524 P.2d 1404, 1406 (Or. 1974)).

In this case, the alleged defamation stems from Ms. Holznagel's March 26, 2007, memo criticizing Ms. Edwards's work performance, and the specific statement, "[h]istorically Bobbie [Plaintiff] has had trouble in each building she has been in with [accounts receivable]." (Lackey Decl. (#99) Ex. 112.) In the memo, Ms. Holznagel goes on to describe Ms. Edwards's past requests for transfers, inconsistent performance, and problems communicating effectively. (*Id.*)

First, Ms. Holznagel's memo is correctly categorized as an opinion based on fully

disclosed factual observations.  The statements in dispute are basically an assessment of Ms.

Edwards's work history as requested by Ms. Biggs and recount Ms. Holznagel's own experiences

working with Ms. Edwards.  The memo is entirely in the first person and includes the phrases,

"[w]e transferred her," "I would go and get her started," "at one point, she asked me," "I

explained," "I also made her aware," "[s]he didn't ask me," and "I feel like."  (Lackey Decl.

(#112) Ex. 112.)  The memo also discusses specific instances and interactions between Ms.

Edwards and Ms. Holznagel, describing their conversations about transfers and problems with

certain tasks.  (*Id.*)  The writing style and specific observations reveal that Ms. Holznagel's

statement of opinion relied entirely on the disclosed factual observations and assertions included

in the memo.  Therefore, the alleged defamatory statement qualifies as an opinion in reliance on

disclosed factual observations, and is only actionable if those factual observations are both

capable of defamatory meaning and false.

Ms. Holznagel's statements are capable of defamatory meaning.  The memo references

Ms. Edwards as being "disillusioned," going "up and down with the [accounts receivable]," and

as "perceived as unwilling to change her way of doing things for the betterment of the facility."

(*Id.*)  These statements impute an unfitness on Ms. Edwards's ability to perform her job by

intimating or flat-out affirming her inconsistent performance, inability to stay focused, and

refusal to work with other people.  These are important characteristics in Ms. Edwards's field of

employment, and Ms. Holznagel's memo is therefore capable of defamatory meaning.

While capable of defamatory meaning, the record before the court reveals that Ms.

Holznagel's statements are not false.  Ms. Edwards's  accounts receivable performance did "ebb

and flow" as stated by Ms. Holznagel. (*Id.*)  A trend report from the end of 2003 through the beginning of 2007 shows that accounts receivable percentages ranged from under five percent in several months to well over thirty percent in several others. (Lackey Decl. (#117) Ex. 8 at 3-6.) Even Ms. Edwards's earlier performance reviews, while complimentary, note differences in accounts receivable from two percent to nearly twenty percent. (Edwards Decl. (#97) 101-06.) Furthermore, the memo discusses transfers between facilities, and the record clearly demonstrates that Ms. Edwards did transfer on two occasions, once from Forest Grove, Oregon to Shaw Mountain, Idaho, and a second time from Shaw Mountain to Piedmont, Oregon. (*See id.*; Second Am. Compl. (#90)  ¶¶ 22, 24.)  Moreover, the criticisms directed at Ms. Edwards's communication skills reflect similar issues and criticisms that were well-documented in performance reviews as far back as the mid-1990s. (Edwards Decl. (#97) Ex. 101-02.)

Ms. Edwards puts forward a hyper-technical and parsed reading of Ms. Holznagel's memo and tries to argue that she did not historically have problems with accounts receivable in *every* building she had been in because several of her past performance reviews from the Forest Grove and Shaw Mountain facilities were excellent.  While I must evaluate the evidence in the light most favorable to the non-moving party, Ms. Edwards still must point to evidence on which a rational jury could rely to find defamation.  For the reasons discussed above, however, the performance reviews in the record generally support Ms. Holznagel's observations of varying performance and difficulty communicating with co-workers.  Additionally, Ms. Holznagel's memo notes that Ms. Edwards "started out at Forest Grove doing a great job," illustrating that defendants did not assert she had always performed poorly in every building. (Lackey Decl.

PAGE 18 - OPINION & ORDER

(#117) Ex. 8 at 2.)  As a result, Ms. Holznagel's statements remain substantively true and do not

support Ms. Edwards's claim of defamation.

Aside from her performance reviews, Ms. Edwards does not offer or point to any other

contradictory evidence.  Although the memo's tone may arguably be overly-critical or somewhat

unfair in its description of Ms. Edwards's performance in light of her past successes at Marquis,

the existing record shows the factual statements are not false and do not support a defamation

claim.  Therefore, I conclude Ms. Holznagel's statement is a non-actionable opinion based on

disclosed, true factual observations and summary judgment is appropriate.

## III.    Wrongful Discharge

Ms. Edwards's final claim is for wrongful discharge against Marquis.  She asserts that her

wrongful discharge claim does not fail because it is premised on her claims under FMLA and

OFLA.  (Pl.'s Resp. (#96) 31.)  Because I denied summary judgment at oral argument as to her

interference claim under FMLA, I agree with Ms. Edwards's assessment and also DENY

summary judgment as to the wrongful discharge claim.

Wrongful discharge claims are permissible in two situations: (1) an employee is

dismissed for performing an important societal obligation; or (2) an employee is dismissed for

exercising an employment related right of important public interest.  *Babick v. Or. Arena Corp.*,

40 P.3d 1059, 1062 (Or. 2002).  FMLA and OFLA both reflect an important public interest and

raise issues of fact as to wrongful termination.  *Yeager v. Providence Health Sys. Or.*, 96 P.3d

862, 866 (Or. Ct. App. 2004) ("We need not look far to find a public policy [in FMLA and OFLA

claims]."); *Sanders v. City of Newport*, No. 07-00776-TC, 2008 WL 2234085, at *13 (D. Or.

Mar. 30, 2008) (finding that the same facts alleged in FMLA claim can also preclude summary

judgment on wrongful discharge claim).  Statutory remedies under FMLA and OFLA also do not preempt a wrongful discharge claim based on the use of medical leave.  *Sanders*, 2008 WL 2234085, at *12 (citing Or. Rev. Stat. § 659A.150).

      Here, Ms. Edwards created an issue of fact as to her FMLA interference claim and whether her protected leave was a negative factor in her termination.  Therefore, her claim for wrongful discharge also survives summary judgment.  The temporal proximity of disciplinary action and protected leave, the drop in subjective performance evaluations, and allegations of Holznagel's combative tone all raise a genuine issue of fact as to whether Marquis interfered with Ms. Edwards's rights under FMLA.  Because Ms. Edwards has created this issue of fact as to her interference claims under FMLA, she has also created an issue of fact as to her wrongful discharge claims where she was exercising an employment related right of important public interest.  Therefore, I DENY defendant's motion for summary judgment as it pertains to Ms. Edwards's wrongful discharge claim.

## CONCLUSION

      Based on the foregoing, Marquis's motion for summary judgment is DENIED as to the disability discrimination and wrongful discharge claims.  Summary judgment is GRANTED as to the defamation claims against both Marquis and Ms. Holznagel.

IT IS SO ORDERED.

Dated this  6th  day of August, 2009.

                             /s/ Michael W. Mosman
                             MICHAEL W. MOSMAN
                             United States District Judge